Marvin, J.
The first question to be considered is, has the city of Buffalo power to contract for, purchase, take and hold the real estate in question for the purposes of a market ? This power is denied by the plaintiffs. By the charter of 1832, the common council of the city of Buffalo was authorized “ to establish and regulate a market or markets in said city, and to restrain and regulate the sale of fresh meat and vegetables in said city.” By the act of 1843, consolidating and amending the act to incorporate the city, passed in 1832, and the various acts amendatory thereof, it is declared that the common council shall have the management and 'control of the finances, and of all the' property, real and personal, belonging to the corporation, and shall have power within said city from time to time to make such ordinances, by-laws and regulations, &c. &c., and the council is particularly authorized to enact such ordinances, for many purposes, among them, in subdivision 4, “ to direct the location, and regulate and prescribe the management and use of all butchers’ stalls and shops, markets, slaughter houses and houses for storing powder ; to establish and regulate markets for the sale of fresh, pickled and corned meats, vegetables, and fresh fish,” &c. By the act of 1843) all acts and parts of acts inconsistent with, or repugnant to that act were repealed. It is argued that the provision in the original charter, giving power to the common council “ to establish and regulate markets,” was repealed by the act of 1843. This provision in the act of 1832 is not inconsistent with or repugnant to the act of 1843, and in my opinion it was not repealed by the latter act. But if we should regard it as being repealed, I think the question will not be changed. The power is given in the act of 1843 “ to establish and regulate markets.” It is said'that this power by the act of 1843, is to be exercised only by enacting ordinances. This may be so. The power, however-, will be the same, though its mode of execution may be regulated by the act. The manner *296 of introducing this power in the act and context, may be proper subjects of consideration upon the question what the power is. I shall first consider whether the power given in the act of 1882 to the common council “ to establish and regulate markets in the city,” conferred upon the council the power to purchase real estate for the purpose of erecting market buildings thereon. The plaintiffs insist that this language does not confer the power: that it confers a power only to point out the place and declare where and under what circumstances a market may exist, and to regulate it. What is a market ? It is a franchise or liberty derived from the crown and arising from the king’s grant or prescription, (which supposes an ancient grant,) to have a market. (2 Bl. Com. 37, 38.) “ A market is the privilege within a town to have a market. Every fair is a market, but not e contra. (Crabb’s Law of Real Property, § 679.)
No one can have a market or fair but by grant or prescription. (Id.) This franchise may be granted to natural persons or bodies politic. The grantee of the franchise has the right to have the market, but the public have also an interest in the market, and the grantee of the. franchise is bound to provide suitable accommodation for those who attend the market. (Id. § 680.) In Mosley v. Walker, (7 B. & C. 40,) Bay ley, J. says, “ if the place once allotted ceases to give reasonable accommodation, he is bound if he has land of his own to appropriate land on which to hold it, and if not, to get land from other people, in order that the market, which was originally granted for the benefit of the public as well as for the benefit of the grantee, may be effectually held.” (See also Jacob’s Law Dict. Market.)
As I understand, the grant by the king was the grant of a market or the right or privilege of having a market. After ascertaining what a market is, in law, it may be asked what more appropriate terms can be used by the power granting the franchise or market, than to say that the common council, city or individual may establish a market ? It seems to me that “ the privilege, within a town, to have a market” is very properly and fully granted, by authorizing the common council “ to establish and regulate a market.” The power to establish a market being *297 expressly granted, all the powers necessary for the exercise of this power are implied. The power expressly granted, or right expressly given, could not be carried into effect or exercised without land, and therefore the common council had the power to purchase, take and hold the land necessary for the, establishment of a market. (Angell & Ames on Corp. 66.)
By the act of 1843, the general powers, contained in title 3 of chapter 18 of the 1st part of the revised statutes, were conferred upon the city, and it was made subject to all.the restrictions and conditions contained in said title, except certain provisions in the title which were declared inapplicable. By the 4th subdivision of section one, in said title, the corporation is empowered “ to hold, purchase and convey such real and personal estate as ■the purposes of the corporation shall require, not exceeding the amount limited in its charter.” This provision was made a part of the charter of Buffalo city. In my opinion it is not necessary to resort to the power here given, to uphold the purchase of real estate for a market, but I think the power is sufficiently comprehensive in this provision to authorize the purchase of the real estate in question, especially when we find in the charter that one of the purposes of the corporation was the establishment of markets. Can it be successfully denied that an incorporated city requires a market or markets, and that one of the purposes of incorporation is the establishment and regulation of necessary markets 1 May not well regulated markets be necessary for the good government of the city, the preservation of peace and order, and for the benefit of the trade, commerce and,health of the city ? The city, or the common council, is expressly authorized to establish markets; one of the purposes of the corporation was the establishment of markets ; this is specified in the charter; and to accomplish and carry into effect this purpose, real estate was required, and the authority to hold and purchase such necessary real estate is expressly given by the provision referred to in the revised statutes. The common council could not establish and regulate markets unless it had land upon which the necessary buildings might be erected, and upon which the market could be held. The common council had the grant *298 of the privilege to have markets within the city, and upon accepting the grant of this privilege, it was “ bound to furnish suitable accommodation for those who attended the market.”
Upon the argument there was much criticism upon the word establish. It was argued that the legislature only intended to empower the common council to designate where the market might be had or held, and that an individual might have and own the market, subject to the regulation of the common council. The word establish, it seems to me, is not well adapted for the purpose claimed by the plaintiffs. It is a word of extensive use and signification. It contains authority to do an act or acts, which shall produce or bring into existence something; to set or fix firmly; to settle permanently or found permanently; to erect and fix something. The acter or establisher is to do the thing. It is not a term used to indicate a power to permit or license another or others to do the thing. But the authority to any one to establish a thing, is an authority to take the proper measures to produce, accomplish or bring into existence the thing. In the present case the power was given to the common council to establish markets. It is well understood what a market was. Aside from its being a franchise, a “ privilege within a town to have a market,” as defined by the common law, the term as now used and understood in connection with our cities, includes the idea of land and buildings or suitable erections for the accommodation of those who attend the market to sell or buy the articles brought there for sale. ISTow the common council was authorized in proper language to establish this thing, called a market, and in doing so it had power to adopt all the necessary means for the purpose of accomplishing the object. It was necessary to have real estate, and it was authorized to acquire the necessary quantity of real estate in the usual manner. If the common council were to give permission to individuals to have markets, and designate the places where they should be located or established, (provided it had power to do so,) this would not be the establishing of a market by the common council. It may be that the common council had the power under the charter of 1845, to authorize individuals to have markets. *299 It had power “ to direct the location, and regulate and prescribo the management and use of all butchers’ stalls and shops, markets. slaughter houses, and houses for storing powder.” Assume that individuals may have markets located where the common council shall direct, subject to be regulated, &c., and it will not affect the question we are considering. On the contrary our position will be, I think, strengthened, for it is immediately added, “ to establish and regulate markets,” &c. If it was only intended to give the common council power to locate and regulate markets to be owned and held by individuals, the power had been already given, and it was quite unnecessary to give in express terms to the common council the power “ to establish and regulate markets,” <fec. In my opinion, the power to purchase real estate for the purposes of a market, was possessed by the common council, and therefore the contract made with Austin was not void for want of competent authority to make the purchase of the land for the purposes of a market. One of the counsel for the defendants examined and referred to numerous charters of cities and villages in this state, in which the language touching markets was like or similar to the language employed in the Buffalo charter, and under which it was said those cities and villages had purchased land and erected market buildings. I have not deemed it necessary to examine the various and numerous charters referred to. I have no doubt the language of them is, in substance, as it is in the charter of the city of Buffalo, and that this language “ to establish markets” has generally been employed, and that under the power thus conferred, all cities have claimed the right to purchase land and to erect buildings thereon for market purposes. As I have already stated, I think the language appropriate to confer the power thus claimed and exercised,
Austin proposed and agreed to sell and convey to the city the land in question, and to accept in payment the bond of the city, payable at the end of twenty-five years, with semi-annual interest. The proposal signed by Austin contained some other provisions not necessary to be here noticed. The common council accepted the proposal, and Austin executed the deed of *300 the land to the city, and the common council directed the mayor to execute the bond, and it was executed, and the seal of the city attached thereto. It is insisted that the contract for the sale and conveyance of the land and the giving the bond were unauthorized ; that the contract was void; and that the bond is invalid.
It is a general rule, that a corporation is a mere political institution, a creature of the legislature, having no other powers than those which are given by its creator, or such as are incidental or necessary to carry into effect the purposes for which it was established. This rule was laid down by Chief Justice Savage, in N Y. Firemen Ins. Co. v. Ely, (2 Cow. 709.) The company had been incorporated for the purpose of insurance, and it had used its funds in discounting notes. This was an act of banking not authorized by its charter, and violative of the restraining acts. It used to be said that a corporation could do any thing not prohibited by its charter. This is not so. The true rule undoubtedly is, to consider the nature, purposes and objects of the corporation. If a corporation is created for a particular purpose, it may exercise all the powers necessary and proper to carry into effect the objects of its creation, and to accomplish the purposes in view, unless it is subject to some other law restraining it from the exercise of particular powers. (Ang. & Ames on Corp. 66.) Civil corporations are established for a variety of purposes. They are public or private. Public corporations are those created by the government for political purposes, as counties, cities, towns and villages : they are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and these powers are subject to the control of the legislature. (2 Kent, 275, 5th ed.) When a corporation is duly created, many powers, rights and' capacities are annexed to it; some of these are deemed to be necessarily and inseparably incident to it, without any express provision. It is now, however, the general practice, to specify the powers and capacities with which it is intended to endow the corporation. (Id. 277.) As to the powers and capacities which are incident to a corporation, as specified in Angell & Ames, 64 and 65, arid in 2 Kent’s Com. 277, 8. 1st. to have perpetual *301 succession, &c.; 2d. to sue and be sued, and to grant and receive by its corporate name ; 3d. to purchase and hold lands, chattels, &c. &c.; the simple creation of a corporation, as a general rule, conferred upon it incidentally, these powers. They were regarded as necessary to its existence as a corporation. Some of these powers, that were regarded as incidental and necessary, whether specified in the charter or not, have been much abridged or modified by general laws. In England, corporations are rendered incapable of purchasing lands without the license of the king, by what are known as the mortmain statutes. These statutes have not been enacted in this state, and Kent says, the only legal check to the acquisition of lands by corporations, consists in those special restrictions contained in the acts by which they are incorporated, and which usually confine the capacity to purchase real estate to specified and necessary objects. (2 Kent, 282.) We have, however, general statutes, containing provisions which are generally applicable to corporations. By section 1, in title 3, chapter 18"of the first part of the revised statutes, it is declared that every corporation shall possess certain powers. By the 4th subdivision it has power “ to hold, purchase and convey such real and personal estate, as the purposes of the corporation shall require, not exceeding the amount limited in its charter.” By the 2d section it is declared that the powers enumerated in section 1, shall vest in every corporation that shall hereafter be created, although they may not be specified in its charter. By section 3, it is declared that “in addition to the powers enumerated in the 1st section of this title, and to those expressly given in its charter, or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given.” The next section contains restrictions upon all corporations other than those expressly incorporated for banking purposes. Here there is a body of statute law touching corporations which has modified the rules of the common law relating to the powers of corporations. I have already commented upon the 4th subdivision in section one, touching the power to hold and purchase real estate, *302 and remarked that this power is limited to such real and personal estate as shall be required for the purposes of the corporation. These provisions of the revised statutes are here brought more prominently and fully into view for the purpose of ascertaining their effect upon the question we are now considering. It will be seen on reading section 1, that the powers which-every corporation is to have, are substantially the same as those enumerated as incidental powers and capacities by the common law, except that the power to hold, purchase and convey real and personal estate is restricted. (See Angell & Ames on Corp. 64, 5. 2 Kent's Com. 277.) In the enumeration of incidental or ordinary powers at common law, the power to contract debts is not expressly named, and yet the power to make contracts is clearly implied. The corporation may sue and be sued, it may grant and receive, it may purchase and hold lands and chattels. The power to contract debts is not expressly named in the provisions of the revised statutes here referred to. And the statute contains an express prohibition against the possession or exercise of any corporate powers other than those enumerated in the first section of the title of that act, and those expressly given in its charter, except such as shall be necessary to the exercise of the powers so enumerated and given. Hence the rule substantially as stated by Justice Savage, in N. Y. Fire Ins. Co. v. Ely, (2 Cowen, 709.) It was not claimed on the argument that the charter of Buffalo city, in express terms, gave the power to purchase land, or to contract a debt for the purchase of land. Still it was claimed that the city possessed the power, not only to purchase land, but to purchase on a credit, and to execute its obligation to pay for it on a future day. I have endeavored to show that the common council had the power by the charter to purchase the land in question, under the authority to establish markets, and also under the provisions of the revised statutes, if the purposes of the city required markets. Tjhe mode of purchasing real estate is not specified, and as the power to purchase existed, I suppose the common council or city in exercising this power, had the right to exercise it in the usual ordinary manner, in the same manner that an individual could *303 exercise it. Concluding that the city had the power to make Í the purchase, and to accept a grant of the land, can there be any doubt that it had the power to execute the usual bond and mort- ' gage as security for the payment at a future day, of the consideration money 1 The transaction between the city and Austin was simply a sale and conveyance of land by the latter to the former, and the giving of a bond by the city to Austin for the consideration, payable at the end of twenty-five years, with semi-annual interest. It seems to me that the city had the power to do this. It certainly had the power to make the contract for the purchase of the land; otherwise it could never have purchased it, and there is no statute or law declaring what contract the city should make in purchasing real estate, or how or when it should agree to pay the consideration. The power to purchase included the power to contract, and to agree upon the terms of the contract. The cases are numerous where a corporation contracting in reference to a matter that was within the purposes and objects of the corporation has bound itself in a manner and form not specified in its charter. The State v. The City of Buffalo, (2 Hill, 434,) is in point to illustrate the position. The common council, by resolution, authorized the mayor to take such measures as he should deem necessary for the safety and defense of the city, and declared that the mayor should have power to bind the city by bond or otherwise, to procure arms, «fee. The mayor obtained arms from one of the state arsenals, and gave the bond of the city, conditioned for the return of the arms. It was objected that the bond was not binding upon the city; that by the charter, no power was given to the mayor or common council, to bind the city by bond, «fee. Justice Nelson referred to statutes authorizing all corporations to purchase such real and personal estate as the purposes of the corporation should require, (1 R. S. 608, § 1,) and to various provisions in the charter giving the common council control over the property of the corporation ; the power to make by-laws, for the purpose of preventing riot, noise, disturbances, <fcc.; and held that abundant authority could be found in these provisions, to justify the common council in authorizing the mayor to bind *304 the city by bond or otherwise. There was not a word in the charter about giving a bond for any such purpose; there was ample power to protect the city and preserve order, but the means by which this was to be done was not pointed out. The common council, therefore, in exercising the power, had the right to resort to any usual and ordinary means. They resorted to the means of procuring the loan of arms from the state, and gave the bond of the corporation for their return, and the city was bound by the bond. All that was. done was within the general purposes and objects of the corporation, and though no express power, to adopt the mode pursued, could be found in the charter or general statutes, yet the city was held liable. Now turn to the case of Hodges v. The City of Buffalo, (2 Denio, 110,) and we shall find a case where the city was not liable. And why ? Simply because no authority was given to the common council to furnish entertainments for the citizens and guests of the city at the public expense. It was not necessary, in order to carry into effect the powers granted, that the common council should provide a public entertainment; and the general powers of a corporate body must be restricted by the nature and object of its institution. (Ang. & Ames on Corp. 66.)
The plaintiffs insist, that whatever may have been the power of the city touching the contracting of debts, &c. it has been restricted by the act passed July 21, 1853, or rather, that the bond was made and delivered, in violation of this act; and as I understood the learned counsel, more reliance was placed upon this statute to defeat the bond, than upon the objection that there was prior to the passage of this act, an entire destitution of corporate authority, to give the bond in question. I have examined this statute with care, and I have come to the conclusion that it has no application to this case, or rather that the plaintiffs have not made a case coming within the prohibitions of the statute. This statute is entitled an act to restrict and regulate the powers of municipal corporations to borrow money, contract debts, and loan their credit. The first section prohibits any municipal corporation from loaning or giving its credit to, or in aid of any individual, association or corporation. *305 This, I take it, could not have been done before the passage of this act. in the absence of any special authority. By the second section, no municipal corporation, Sec. shall borrow money or contract debts, except in the manner therein provided, and evidences of debt, unless issued in conformity to the provisions of the act, shall be void. Then follow §§ 3, 4 and 5, having entirely different objects in view. They contain the “manner herein provided” for borrowing money or contracting debts. By section 3, no municipal corporation, of Sec. shall contract any debt, the amount of which shall, exclusive of the debt now owing by said corporation, exceed at any time a sum equal to 5 per cent,' nor inclusive of such debt, shall the same exceed 8 per cent of the aggregate valuation of the real estate within its boundaries, &c. Here is a prohibition upon all municipal corporations from contracting debts of any kind, exceeding 5 per cent of the aggregate valuation of the real estate within their bounds, or 8 per cent, including the debt owing at the time the act was passed, so that if the amount of the debt at that time was 7 per cent of the aggregate valuation of the real estate, the corporation could only add one per cent more to its debt. This may be a valuable restraint upon municipal corporations. Those who owed no debt at the passage of the act, are protected from any debts exceeding 5 per cent of the aggregate valuation of the real estate. The 4th section relates to temporary loans; no money is to be borrowed on temporary loans, except in anticipation of the taxes of the current fiscal year, and they are to be made payable, and are to be paid within eight months from the time they are made. The 5th section relates to funded debt. Ho funded debt is to be contracted unless it be for a specific object, to be especially stated in the ordinance proposing the same, and the ordinance must be passed by two-thirds of the members elected to the common council, &c.; it must be submitted to, and approved by a majority of the tax-payers at a special election, and the legislature must by law ratify the ordinance, and provide for levying and collecting a tax to pay the interest, and 5 per cent of the debt, which latter is to constitute a sinking fund, for the redemption of the principal of *306 the debt, <fec., <fcc. The sinking fund is to be, and remain sacred and inviolate for that purpose, and the annual tax shall be levied and collected, until sufficient is realized to pay and extinguish the principal of such funded debt, and the interest thereon. The debt mentioned in section 5, is .a different kind of debt from that mentioned in section 3. The limitation in section 3, upon the power to contract any debt, applies undoubtedly to all debts, and includes funded debt, as well as a simple debt; but section 5 does not include all debts, but only a certain kind of debt, called funded debt. Without here stopping to inquire particularly in what sense the words funded debt are now generally to be understood, or whether the meaning of the term has undergone a change, it seems quite clear to me, that the legislature has used the term in this section in its proper etymological sense, or in the sense attached to the term by Hamilton and other writers, in connection with the funding system adopted during Washington’s administration. On examining the provisions of this section, it is seen that a variety of things are to be done to create the debt, and certain provisions are to be made, before the debt can be contracted, which insure the payment of the interest of the debt, and provide a sinking fund for the redemption of the principal of the debt. The sinking fund is to be and remain sacred and inviolate for the purpose of paying the principal. The annual tax is to be levied and collected until sufficient is realized to pay and extinguish the principal of the debt and the interest thereon. The legislature, after the common council, and a majority of the taxpayers have acted, is to ratify their acts, and is to provide by law for levying and collecting annually a sufficient tax to pay the interest and 5 per cent of the principal, and this 5 per cent is to become a sinking fund sacred and inviolate. Ho one, I think, would hesitate to say that a debt so secured, is a funded debt. It is protected by a law of the legislature, binding upon the corporation, and which in effect pledges all its taxable property for the payment of interest and principal, and which may be enforced by a mandamus. Can there be any doubt, that a mandamus would lie to compel the common council to levy and *307 collect the taxes necessary to execute the provisions of the act 7 The sinking fund will be a trust fund for the payment of the principal, and the common council will have no power to divert it to any other purpose. It seems to me, when all the provisions of this section are considered, that no one can doubt that a debt so created, so protected and secured, is a funded debt, and that the legislature have properly so termed it and distinguished it from a simple debt to which these extraordinary securities are not attached. The security for the payment of the debt does not depend simply upon the good faith of the municipal corporation to provide and faithfully administer the funds, or to faithfully appropriate the funds already provided, and abstain from diverting them ; as is generally the case with independent nations ; for here, the municipal corporation is under, the control of the legislature, bound by its law, and which law can be enforced in the courts.
The debt mentioned in section 3, is of an entirely different character. It is not protected and secured in its origin, as the debt mentioned in section 5 is. It is a simple debt owing by the municipal corporation, resting upon no special securities for its payment. It is in no sense a funded, debt. To call it a funded debt, would be confounding all distinctions. The $35,000 debt in question belongs to the class of debts mentioned in section 3. It is a simple debt against the city, and as it does not appear that in creating it, the common council exceeded the limitations contained in section 3, the evidence of the debt is not void according to section 2. My attention was called on the argument, to the language, “ to pay the principal and interest or any part thereof, of the loan or funded debt of- the city,” as used in section 3, of title 5 of the charter of 1843, as amended in 1850. It may be that the legislature used the term “ funded debt,” as synonymous with loan. If so, it was an incorrect use of the term, and can have no effect upon the construction given to the term as used in section 5, of the act of 1853, in which the nature of the debt appears, and which we should name a funded debt if the legislature had not. It may also be, that the term funded debt as used in section 6, title 5 of the *308 new charter, passed in 1853, was used in reference to a general» debt owing by the city either upon its bonds, payable at a future day, or for a loan contracted. If this is so, I have only to repeat the remark above made. It appears, however, that in the act passed April 8, 1850, the city was authorized to fund its floating debt by issuing its bonds or borrowing money upon them $ the money borrowed was to be applied to the payment of its floating debt. Section 3, in title 5, is then so amended as to require the common council to include in the taxes, such sums as should be necessary to pay the principal and interest, &e. of any debt due from the city for moneys borrowed tinder the act, or any special acts that have been, or may be passed for that purpose, &c. The debt thus to be contracted is then referred to as a loan or funded debt. It is not clear that the term funded debt, is not properly used here as applicable to “ moneys borrowed” under a special law requiring the common council to raise by tax money to pay the interest and principal, &c. But I will not' pursue the subject. This may also explain the use of the term in the new charter. The act touching municipal corporations passed July 21, 1853, was undoubtedly enacted in pursuance of the requirement in a portion of'section 9, of article 8, of the constitution, which makes it the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments, and in contracting debts, by such municipal corporations. The subject of municipal corporations, their powers of taxation, and to contract debts, &c. were discussed in the convention, and a committee upon those subjects was appointed. An article was reported by the majority, and another by the minority of the committee. (See Conv. Jour. 579, 580, 775.) The whole subject was found to be extremely difficult, and it resulted in the provision now contained in the constitution making it the duty of the legislature to restrict the power of taxation, <fec. The 4th section of the act of 1853, relates to temporary loans. A loan is 'something quite- different from a debt. A loan contracted ere *309 ates a debt, but there may be a debt created without contracting a loan. By a temporary loan we understand something different from the general term loan. Under the term loan, simply, the time for payment ■ may be fixed in the discretion of the parties to the contract for the loan. As already stated, a debt may be contracted without resorting to a loan; hence it may well be that a corporation may have the power to contract a debt for property which it is authorized to purchase, and not have the power to borrow money, or contract a loan, or issue its bonds as stock for the purpose of raising money upon them. The constitution above cited recognizes a difference between “ borrowing money” and contracting debts. I have endeavored to show that the city of Buffalo had the power to purchase the land in question, and that this power included authority to make a contract for the purchase, and to make it in any manner and upon any terms not violative of law; that there was no restriction upon the power as to the mode or manner of its execution. The city made the purchase and gave its bond. Such was the simple nature of the transaction. The question of power to borrow money, to contract loans, to issue stock, are not included in the present inquiry, and as to those powers, I express no opinion. Reference was made upon the argument, to numerous special statutes authorizing municipal corporations to purchase land for certain purposes, and to borrow money, &c., and from these statutes it was argued that the city of Buffalo, under its charter, had no authority to purchase the land in question or contract the debt. I do not think that much reliance can be placed upon an argument against the power exercised in this case, founded upon the fact that cities have procured special legislation authorizing them to purchase land for a market, &c. Such course may have been adopted from extraordinary caution, or to obviate any doubt or question. It is proper, however, to consider the argument and ascertain the facts. I have examined all the statutes referred to by the counsel for the plaintiffs, w'hich are at hand, and I find that in all of them the special legislation had reference to borrowing money or- to contracting a loan for certain purposes, &c. Thus in the act of 1835, relating to the *310 city of Buifalo, the common council is authorized to borrow money upon the credit of the city for the purpose of purchasing market grounds, and erecting suitable buildings thereon, &c., and the city was to give its bond for the loan authorized. By the act of 1838, the common council of the city of Buffalo was authorized to borrow money on the credit of the city, and give a bond for the loan. So by the act of 1839, the common council "of the city of Buifalo was authorized to borrow' money on the credit of the city, for the purpose of erecting a workhouse.
By the act of 1842, the common council was authorized to renew any loans then made by the city, or to create new loans for the purpose of paying a former loan, by executing the necessary bonds, &c. By the act of 1845, the common council was authorized to borrow money upon the corporate bonds of the city, to be applied to the existing liabilities of the city. By the act of 1850, the common council of the city of Buffalo W'as authorized to fund the floating debt of the city, chargeable upon the general fund, by issuing the corporate bonds of the city, or to borrow money upon the bonds, to be applied to the payment of the fldatihg'de'bt.” The act of 1852 contained the like powers. By the -act of 1853, passed in February, the common council of Buffalo 'was authorized to purchase real estate for its corporate-use, and it was authorized, for the purpose of paying for the real estate^ to borrow not exceeding $100,000, on the credit of the city, and execute the bonds of the city therefor. By another act of 1853, passed in April, the council is authorized to borrow on the credit of the city, money for the purpose of reimbursing the general fund for money expended in improving the “ Elk Street Market Grounds,” and erecting a market house thereon, and for that purpose to cause the bonds of the city to be issued. So in the act of 1836, amending the act to incorporate the city of Rochester, power is given to purchase a market lot or lots for the use of the city, and to build a market thereon; and for that purpose to loan on the credit of the city, $15,000, and authorizing the council to create a stock to be denominated the “ market stock.” Thus it is seen that all these statutes *311 contain provisions touching the borrowing of money, contracting a loan, or creating a stock, for purposes specified. An argument may perhaps be fairly deduced from these statutes, that the power to borrow the money specified, and for the purposes specified, or to contract the loan, <fcc., did not exist, but no argument can be. deduced from them to show that a municipal corporation, having the power to purchase real estate for a particular purpose, may not make the purchase on credit, and give its bonds payable at a future day, with interest payable annually or semi-annually.
[Erie Special Term,
May 29, 1854.
In my opinion the common council, in making the purchase of the real estate of Austin and giving the bond, did not exceed its authority. The contract was therefore binding upon the city ; the city has acquired title to the land, and the bond is obligatory upon the city.
The complaint must be dismissed, and there must be judgment for the defendants, for costs.
Marvin, Justice. Affirmed, on appeal, at the General Term in Erie county, November 12, lSSAMarró-, Bowen and Greene, Justices, when the above opinion was ¡ the court.]