THE PEOPLE *ex rel.* James B. Taylor and others *vs.* MAT-THEW T. BRENNAN, Comptroller of the city of New York.

Where an officer of a municipal corporation undertakes to set at naught the corporate will, by refusing to execute or deliver the bonds of the corporation in payment of the price of lands purchased by the corporation, a *mandamus* is the appropriate and proper remedy.

The writ may also be applied for by the vendor who is beneficially interested in enforcing the contract, after a resolution has been passed by the common council directing the officer to carry out and complete the purchase; where the corporation assents to the making of the application by the vendor.

Where T. offered to sell to the city of New York certain property, either for cash or corporate bonds, and the corporation, by resolution, accepted the offer, the payment of the price to be made in corporate bonds; *Held* that this constituted an agreement whereby payment was to be made in bonds; and that there being no legal remedy other than a mandamus, by which the vendor could obtain the bonds, that remedy was appropriate.

In all cases where an officer of a corporation refuses to comply with the lawful directions of the corporate body, and a mandamus is sued out by the party for whose benefit and in whose favor the directions are given, with the consent of the corporate body, the party will be relieved in that manner, without being put to an action against the corporation, for a specific performance.

Where, on an order to show cause why a peremptory mandamus should not issue, the facts are admitted, or the excuse offered is insufficient, the court

The People *v.* Brennan.

will, if the decision be in favor of the relator, direct a peremptory mandamus, without the previous issuing of an alternative writ. CLERKE, J. dissented.

If the only material disputed fact does not, even conceding it to be as the defendant alleges, furnish any satisfactory cause against issuing the mandamus, it is unnecessary to direct an alternative writ for the purpose of having a trial respecting that fact.

Where by a resolution of the common council of the city of New York, the comptroller of the city was directed to carry out and complete a purchase of real estate on behalf of the city, by issuing the corporate bonds, for the purchase money; *Held* that it was no excuse for the non-performance of this duty, by the comptroller, that the vendors had no title to the land, but the title was already in the city.

*Held* also, that the fact that the title was derived from D. who had purchased the property from the city and had taken a conveyance of it while he was an officer of the corporation, and thus incapacitated to purchase from the city, would not excuse the comptroller from complying with the resolution.

A power in a municipal corporation to purchase carries with it a power to incur an indebtedness for the purchase money, and to provide for the payment of the indebtedness; unless that power is so restricted that it cannot be exercised unless there are sufficient funds in hand to pay for the property.

If the corporation of New York, on purchasing property, has no funds which can be appropriated to the payment of the price, it may purchase on credit, and may issue its obligations promising to pay the indebtedness at a future time, and make subsequent provision for their payment.

An order for a mandamus, which directs that the comptroller of the city of New York shall be required by such writ to procure the signature of the mayor, and the corporate seal to be affixed to bonds, is erroneous. The writ should only require the comptroller to do those acts which lie in his department, and are personal to himself, viz: the preparation of the bonds, and his own signature to them.

APPEAL by the defendant from an order made at a special term, awarding a writ of peremptory mandamus. On the 20th December, 1852, the common council of the city of New York passed a resolution, which was approved by the mayor, directing that "the land to be made on the North river, together with the bulkhead, between Gansevoort street and Twelfth street, be sold to D. R. Martin, or any other applicant, and that it be referred to the commissioners of the sinking fund to fix the terms and price of sale." On the 27th of December, 1852, at a meeting of the commissioners of the

sinking fund, a resolution was adopted, as follows: "*Re-solved*, That the price of the premises, as designated in the aforesaid resolution, be fixed at the sum of one hundred and sixty thousand dollars." It was then further resolved by these commissioners "that the comptroller be authorized to issue a grant for land under water; including bulkhead now built on the North river, between Gansevoort street and Twelfth street, extending to the exterior line of the city as now fixed, and containing the usual covenants, to Reuben Lovejoy, at the sum of one hundred and sixty thousand dol-lars, upon the terms fixed December 24, 1852, the grant for the same to contain a stipulation guarantying to the cor-poration the privilege of depositing coal ashes from the fifth, eighth, ninth, fifteenth and sixteenth wards in said premises, until the same are filled in." Lovejoy assigned his interest in the contract to Simeon Draper, then a governor of the alms-house, and directed the deed to be made out to him. On the 27th of December, 1852, the mayor, aldermen and commonalty of the city executed a grant or conveyance of said premises and delivered the same to Draper. Mr. Draper, simultaneously with such delivery, handed back to the deputy comptroller his bond and mortgage to the said the mayor, aldermen and commonalty, dated 27th of December, 1852, upon the said premises, to secure the sum of $120,000, pay-able, &c., and also his, said Draper's, check for $40,000, and executed a counterpart of said conveyance. Draper being one of the officers of the corporation, and thus incapacitated to purchase from the city, and the disqualification being dis-covered, Mr. Joseph B. Varnum was substituted as purchaser, in his place. On the 30th of December, 1852, the mayor, aldermen and commonalty executed and delivered to Varnum a new grant or conveyance of the same premises for the same consideration. Said premises were never put up or sold at public auction, and the only difference between the two grants above mentioned was that, in the first of them, the name of Simeon Draper, Esq. appears as the grantee, and in the

second of them the name of Joseph B. Varnum appears as grantee. On the 30th of December, 1852, Simeon Draper and Frances S. his wife, executed and delivered a quitclaim of said premises to Joseph B. Varnum. ' On or about November 3, 1862, James ·B. Taylor, one of the respondents, addressed and caused to be delivered to the mayor, aldermen and commonalty of the city of New York, an offer in writing, to sell to the city the same property upon certain terms specified in the offer. On the 3d of January following the common council passed resolutions of acceptance, and directed the comptroller to carry out and complete the purchase, by the issue and delivery of the corporate bonds of the city for the amount of the purchase money. The resolutions had been previously vetoed by the mayor, but they passed both branches of the common council on the day above stated, notwithstanding the veto, no objection to the final action upon them being made. Afterwards Taylor caused a deed to be duly executed in accordance with the terms of the offer and resolutions, and on the 3d of February, 1863, he tendered the same to the comptroller and demanded the bonds. The comptroller refused to execute or deliver them, assigning but *one* reason for his refusal, which was, in substance, that the grantors named in the deed had not a good title, the title being already in the city. The substantial ground of objection being the appearance of Mr. Draper, in the transaction. Upon an affidavit setting forth these facts, an order was made by this court, on the 5th of February, requiring the comptroller to show cause why he should not be compelled by mandamus to issue and deliver the bonds. On the return of the order he appeared and submitted certain affidavits, deeds and other papers in support of his refusal to comply with the resolution. The court held that the facts thus presented constituted no ground for the comptroller's non-compliance with the directions of the common council, and made an order on the 24th of February, 1863, directing a peremptory mandamus to issue, "commanding him, as comptroller

of the city of New York, forthwith to prepare the corporate bonds of said city in due form, for the aggregate amount of five hundred and thirty-three thousand four hundred and thirty-three dollars and fifty cents, in sums of not less than one thousand dollars each, payably to bearer, or to the order of the parties respectively entitled to receive the same, or to their representatives or assigns, and bearing date on the 3d day of February, A. D. 1863, the principal of which said bonds shall be payable in not exceeding ten years from the date thereof, with interest from that date at the rate of six per cent per annum, payable quarterly; that when said bonds are so prepared he, the said Matthew T. Brennan, shall duly sign the same as such comptroller and forthwith procure the same to be duly signed by the mayor of said city, and countersigned by the clerk of the common council, and sealed with the corporate seal of said city, and that he thereupon deliver the same to the said relators, James B. Taylor, Joseph B. Varnum and Douw D. Williamson, their representatives or assigns, in the proportion to which they shall be respectively entitled to the same, on their delivery to him, the said comptroller, of the deed mentioned in the affidavit, upon which the said order to show cause was granted."

*John E. Develin,* for the appellant. I. The relators, if they have any valid claim for this amount, against the city, have a perfect legal remedy by which they can recover and collect it. The pretended ordinance of purchase directs the comptroller to pay the purchase money, either in cash or by the corporate bonds of the city. He has refused to do either. The relators then may bring an action against the city, for the purchase money, and, if the sale and purchase be valid, they can recover. The legislature having made an appropriation to pay judgments against the city, the relators' remedy by action, if they have any rights, is complete. Or, they might collect their judgment against the city, by execution sale of its property.

II. The corporation of the city of New York would, upon a proper showing, be entitled to a mandamus, to compel their officer (the comptroller) to obey their directions, and to carry into effect the requirements contained in their resolutions; but the relators are not entitled to the writ.

III. The issuing or refusal of a mandamus is, in some degree, within the discretion of the court; and when the writ would be unavailing, the court will refuse it, although a case for it be made out. (*Van Rensselaer* v. *Sheriff of Albany*, 1 *Cowen*, 501.) It is not within the power of the comptroller to execute the corporate bonds of the city. The seal of the city must be affixed to the bonds by the clerk of the common council, in whose custody the seal of the city is by law. (§ 36 *of Charter of* 1857.) The court, by its mandamus, directs that the comptroller shall execute the bonds. This order cannot, as a matter of course, be complied with by him. The clerk may refuse to use the seal, and he should therefore have been made a respondent. Under the above rule, therefore, regulating the issue of this writ, the court should not have granted it, as its issue cannot certainly afford the relief sought for by the relators.

IV. The corporation of the city has no power to issue bonds, other than bonds in anticipation of the revenue, without specific authority from the legislature. It is specially prohibited from borrowing money, (§ 33 *of Charter of* 1857, *ch.* 446 *of Laws of* 1857,) and the present proceeding is but an indirect mode of borrowing money to pay for this land, there not being any money appropriated for such a purpose, and the charter of 1857 not permitting any money to be paid out of the city treasury, except on a previous appropriation. (§ 31 *of ch.* 446 *of Laws of* 1857, *p.* 874.) The court will not permit, much less compel, a party, by indirection, to do an act which he is prohibited from doing directly.

V. The pretended ordinance accepting Taylor's offer, and directing the payment of the purchase money, is of no validity whatever. As appears by the certified copy of the pro-

ceedings of the boards of aldermen and councilmen in this matter, this ordinance, after having been vetoed by the mayor, was passed by the councilmen on the 3d of January, 1863, and, on the same day, acted upon by the aldermen, *without unanimous consent.* This proceeding is in direct violation of section 37 of charter of 1857, which is in these words : " No ordinance which shall have passed one board shall be acted upon by the other board on the same day, unless by unanimous consent." The resolution to purchase is an ordinance within the meaning of this section, so far as the selection of the land and the limitation of the price are concerned. *(The People, &c.* v. *Lowber,* 28 *Barb.* 65, 71.) This proceeding, then, of the aldermen, in acting upon the ordinance upon the same day it passed the board of councilmen, was without authority, and against positive legislative direction, and therefore utterly invalid. No acceptance of the offer to sell has therefore taken place, and the relators, consequently, have under this ordinance no rights upon which to ask for the writ prayed for.

VI. The offer to sell these premises and the pretended acceptance imply, by the terms of each, that a good title was to be conveyed to the city by the relators. The rule of law, too, is that where one offers to sell a piece of real estate, and another accepts the offer, the latter will not be compelled to perform his part of the contract, unless the former can convey him the land by a good and valid title. This rule is applicable here ; and it is submitted that neither the relators nor any of the parties under whom they claim ever had, or now have, a good and valid title to these premises. By the laws, ordinances, deeds, affidavits and proceedings of the commissioners of the sinking fund, before the court, it appears, beyond dispute, that the premises, or a very considerable portion of them, were conveyed to the city by the United States government and John L. Atherton, in the year 1850, and that they composed part of the real estate of the city. The real estate and the proceeds of the sales of it

were pledged by the ordinances of the city, passed May 11, 1844, to the payment of the debt of the city, incurred for the introduction of Croton water. The commissioners of the sinking fund had no authority over the real estate of the city, so far as its disposal was involved, other than to sell it at public auction, (same ordinance.) This ordinance the legislature enacted, (*Laws of* 1845, *ch.* 225, § 5,) should " not be amended without the consent of the legislature first had and obtained." *Such consent has never been obtained.* It appears by the authenticated proceedings of the commissioners of the sinking fund, in regard to their action concerning the sale of this property, that they never put it up for sale, or sold it, at public auction ; but, on the contrary, agreed to sell it at private sale to Reuben Lovejoy for one hundred and sixty thousand dollars, to be paid forty thousand dollars in cash, and the balance, one hundred and twenty thousand dollars, by bond and mortgage on the premises, and authorized the conveyance of it to him, upon those terms. This act and proceeding was entirely in excess, and in violation of their powers as commissioners of the sinking fund, and void in toto. It is no answer to say that by the same ordinance the commissioners of the sinking fund were authorized to sell the land under water at a fixed rate. At the time of the passage of this ordinance the city did not own these premises, and, of course, could not have intended to fix the price at which it would sell what did not belong to it ; and from the ordinance and the act by which the state conveyed to the city the land under water on the Hudson river, by which the former secured to the riparian owners the right to purchase the land under water, (*see Laws of* 1837, *ch.* 182, §§ 3 *and* 4,) it is evident that this part of the ordinance refers only to such lands under water as abutted against lands owned, not by the city, but by other parties, who, under the act, had the pre-emptive right. In this case there could be no use for a sale at public auction, for the pre-emptive rights of the owners of the upland would secure

them against competition. The city was the owner in fee, as appears by the papers before this court, of both the upland and the land under water, and there was therefore no difference in their tenure—no reason for exempting either portion from sale at public auction, and consequently the duty of the commissioners of the sinking fund in respect to each was identical. In this view a conveyance to Lovejoy would have been void; but what shall be said of a conveyance to *a party to whom the commissioners of the sinking fund had never agreed to sell or convey the premises,* and he too a party prohibited by law from being interested in the purchase of any real estate belonging to the city? The first grant of this land was made on the 27th of December, 1852, to Simeon Draper, then one of the governors of the alms. house. He paid in cash forty thousand dollars, and gave his bond and a mortgage on the premises for the sum of one hundred and twenty thousand dollars. At the time of this grant to him, there was a provision of law in existence in the following words, namely, "No member of the common council, head of department, chief of bureau, deputy thereof, or clerk therein, or other officer of the corporation, shall be, directly or indirectly, interested in any contract, work or business, or the sale of any article, the expense, price or consideration of which is paid from the city treasury, or by any assessment levied by any act or ordinance of the common council, nor in the purchase of any real estate or other property belonging to the corporation, or which shall be sold for taxes or assessments." (*Laws of* 1849, *ch.* 187, § 19.) The court of appeals have since decided that Mr. Draper came within this prohibition, and that the conveyance to him was voidable. (*Roosevelt* v. *Draper,* 23 *N. Y. R.* 318.) Of course, a party holding property under, or by virtue of, a voidable deed, cannot convey a good title to it. No valid title to this land could therefore be transmitted from Mr. Draper, even though there did not exist the fatal defect, that the commissioners of the sinking fund sold these premises

without authority, and never ordered them to be conveyed to Mr. Draper. On the same day, 27th of December, 1852, Mr. Draper made a conveyance of these premises to Joseph B. Varnum, to whom, on the 30th of December, 1852, three days afterwards, a new grant for them was made out and delivered by the comptroller, Varnum giving back his bond and mortgage to the city for one hundred and twenty thousand dollars, but paying no cash, nor was any cash, other than the forty thousand dollars paid by Draper, ever paid or received by the city, as part of the consideration for the conveyance of these premises to Draper or Varnum. It is impossible, therefore, to conclude but what Varnum either received the benefit of this payment made by Draper, or repaid the amount to Draper, so that in either event if there was really any purchase it was made by Draper, and Varnum took his interest either by the above conveyance by Draper to him or in fact. Varnum knew, or was bound to know, as were all his grantees, that Draper was an officer of the city government at the time of this purchase, if any, and therefore within the very words of the prohibition of the charter of 1849. Omitting the consideration and force of all other questions, this fact alone renders the deeds to Varnum and all his grantees impeachable, and therefore neither he nor they can convey any valid title to the premises.

*J. T. Brady*, for the respondents. I. The offer of Taylor to sell, and the resolutions of acceptance passed by the common council, constituted a valid contract between him and the city, binding him to convey the property, and the city to accept the conveyance, and pay the purchase price according to the terms of the contract. (1.) The offer was to sell the property to the city for the purposes of a market, and the resolutions accept the offer for those purposes, and no other. (2.) It was clearly within the scope of the corporate powers of the city to purchase the property for market purposes. The authority to make such purchases was conferred upon

the corporation by the Montgomerie charter, and has never been taken away. (*Montgomerie Charter,* § 17. *Kent's Notes to City Charter, p.* 100, *and n.* 32, *p.* 254. *Charter of* 1857, § 54 ; *Laws of* 1857, *vol.* 1, *p.* 895. *The People* v. *Lowber,* 28 *Barb.* 65.) (3.) This authority is not, in any respect, taken away or limited by the act of 1853, restricting the power of municipal corporations *to contract debts.* (*Laws of* 1853, *p.* 1135.) The sixth section of that act expressly provides that nothing contained in it " shall be deemed to *alter, repeal or modify* any law now existing authorizing any municipal corporation to borrow money, contract debts, and issue bonds, obligations, or evidences of debt." The authority conferred upon the city by its charter to purchase property for market purposes, is *unaccompanied by any restriction as to the mode in which the power is to be exercised.* It therefore necessarily implies a right to enter into such obligations as may be essential to effect the object for which the power is conferred. (*Angell & Ames on Corporations,* 66. *The People* v. *Lowber, supra. Ketchum* v. *City of Buffalo,* 21 *Barb.* 294. *Barry* v. *Mer. Exchange Co.,* 1 *Sandf. Ch. R.* 280.) The city therefore possesses the power to contract a debt in the purchase of property for market purposes; and hence, in that respect, is excepted by the sixth section of the act of 1853 from the general provisions of that act. (4.) But even if this debt were not within the exception contained in the section above referred to, still the court must hold the resolutions in question to be unaffected by that act, because, 1st. There is *no evidence* in the case that *the debt created by the resolutions would increase the debt of the city beyond the amount specified in the third section of that act.* 2d. The debt is not a *funded* debt within the meaning of the fifth section, and therefore the provisions of that section do not govern the mode of contracting it. (5.) The resolutions were passed in the manner required by the charter. The objection made to their being acted upon

in both boards on the same day was *withdrawn,* and they were therefore acted upon *by unanimous consent.* This was all that the charter required. (*Laws of* 1857, *vol.* 1, *p.* 886, § 37.)

II. The contract of sale was duly performed on the part of Taylor, and therefore the city became bound to execute and deliver the corporate bonds mentioned in the contract to the parties entitled to receive the same. (1.) By the terms of the contract the premises were to be conveyed by a good and sufficient deed, free and clear of all incumbrances except a mortgage held by the city, and all taxes and assessments upon the property. They were to be conveyed with all the water rights and privileges *as the same were conveyed to Joseph B. Varnum by the city by deed bearing date Dec.* 27, 1852, and the deed was to be executed by all the parties who appeared on record to be the owners of the premises, or any part thereof, by title derived from or through *Varnum.* (2.) The deed tendered to the comptroller conformed in every respect to the requirements of the contract, and no incumbrances are shown to exist, except those subject to which the property was to be conveyed. (3.) The *only* objection made to the deed was, *that the grantors had not a good title to the property,* or rather that *the title was already in the city,* and the grantors, therefore, conveyed nothing by their deed. This objection is entirely untenable, and forms no answer to a claim to performance of the contract by the city. It is founded, in part, upon an alleged interest of Simeon Draper in the original purchase from the city. But, conceding the facts to be just as claimed by the comptroller in his communication to the common council, or as they appear in the papers read in opposition to the motion for the mandamus; they do not support the objection, because, 1st. If the deed to Draper was absolutely *void,* then he took no title, and Varnum acquired a good title by the conveyance to him from the city. 2d. But if the deed to Draper was *voidable* only, then the title became vested in *him,* and Varnum acquired a good title

through the deed from Draper. 3d. The deed from the corporation to Varnum vested the legal title in *him*, although the consideration may have, in part, been paid by Draper, and such payment did not and could not create any trust in favor of the latter. (1 *R. S.* 728, § 51.) 4th. The provision in the charter of 1849, (*Laws of* 1849, *p.* 283, § 19,) prohibiting any *officer of the corporation* from being interested in the purchase of any real estate from the city, does not declare that a conveyance by the corporation to *a person not an officer of the corporation*, shall be void if any of its officers shall be *interested in the purchase.* The sole design and effect of the provision was to make void any agreement or arrangement by which any officer of the corporation should endeavor to secure to himself an interest in any property conveyed by it. If, therefore, Draper did, in fact, advance any portion of the purchase money upon any understanding or agreement that he should have an interest under the deed to Varnum, the statute prevents him from enforcing that understanding. But it goes no farther. *It does not affect the conveyance.* But the facts are not as claimed by the comptroller, or as shown by the papers submitted in his behalf. The affidavits of Varnum and Draper explain the whole transaction, and clearly show that *the latter had no interest whatever in the purchase, and did not, in fact, contribute any portion of the purchase money.* It was also urged on the argument at special term, in support of the objection, that the proceedings to sell the property were not in conformity with the provisions of the statute, and, therefore, no title passed to Varnum. *It has been expressly decided otherwise by the court of appeals.* (*Roosevelt* v. *Draper*, 23 *N. Y. Rep.* 318.) The corporation is *estopped*, by the resolutions authorizing the purchase, from denying that the grantors had any title, for those resolutions distinctly *admit a conveyance of the property by the city to Varnum.* It is no answer to a claim to performance of the contract on the part of the city that it *has a better title to the property than the relators.*

III. It is in the power of the city, through its appropriate officers, to perform its part of the contract. The issuing of the bonds is *the exercise of a power which necessarily results from the authority to purchase the property* and contract a debt; for every corporation having the power to contract a debt, must necessarily have the power to give its obligations in payment of the debt. (*State of N. Y.* v. *City of Buffalo,* 2 *Hill,* 434. *Barry* v. *Mer. Exch. Co.,* 1 *Sandf. Ch.* 280. *Ketchum* v. *City of Buffalo,* 21 *Barb.* 294. *Curtis* v. *Leavitt,* 15 *N. Y. Rep.* 62, 66.)

IV. The comptroller improperly refused to perform the duty imposed upon him by the resolutions of the common council, and, therefore, the mandamus was properly issued against him, because, 1st. The resolutions were within the scope of the corporate powers of the city, and were legally passed, for the reasons stated under the first point. 2d. The contract was duly performed on the part of the relators, and they, therefore, became entitled to the bonds. 3d. The objections to the deed were wholly groundless, as already shown. 4th. The resolutions leave no *discretion* to the comptroller to be exercised, except possibly that of determining whether the deed tendered was a good and sufficient one. But that relates to the *form* of the deed, and not to the question whether the parties *had a good title which they could convey.* In respect to the *form* of the deed, *no objection was made,* and, therefore, all the discretion vested in the comptroller must be deemed to have been exercised by him. 5th. The only matter left to his discretion having been determined by him in favor of the relators, the remaining duty imposed upon him was of a *purely ministerial character.* Therefore, even if there could be any doubt as to the title of the relators, he could not refuse performance of the duty enjoined upon him on that ground. The propriety of the purchase, in view of any doubt on that point, was a question for the common council to determine, and he cannot review or oppose their action. (*The People* v. *Flagg,* 16 *Barb.* 503.)

6th. To compel the performance of the duty thus enjoined upon the comptroller, a mandamus was the proper remedy. (*Ex parte Goodell*, 14 *John*. 325. *Hull* v. *Supervisors of Oneida*, 19 *id*. 259. *The People* v. *Collins*, 19 *Wend*. 56. *Ex parte Heath*, 3 *Hill*, 42. *Achley's case*, 4 *Abb*. 35. *The People* v. *Tremain*, 17 *How. Pr. R.* 10. *Crary's New York Practice*, 278, *and cases there cited*.) 7th. The relators have no other remedy to compel the delivery of the bonds.

V. There is not a shadow of pretext for any suggestion that this transaction is infected with fraud. The property was fairly sold and purchased with a knowledge of the purposes to which it was to be applied. The comptroller, in his communication to the common council, distinctly admits that the price was not unreasonable, and Mr. Taylor occupies only the position of one owning land, who having agreed to sell it, is seeking to compel performance by the purchaser of his contract, the seller doing all he agreed to do, and the purchaser having no reason for not performing.

BARNARD, J. The remedy by mandamus is both appropriate and proper in this case. An officer of the corporation undertakes to set at naught the corporate will. Surely the corporation must have some legal remedy to compel its subordinate to obey its lawful behests. It is impossible to conceive of any legal remedy adequate for the purpose other than a mandamus. Assuming that the corporation could have sued out the writ, is there any objection to allowing to the party who is beneficially interested in enforcing the corporate will expressed in his favor, the use of the same remedies which the corporation would be entitled to use? There does not appear to be any well founded objection, so long as the corporation assents to the proceeding being taken against the officer.

Now here we find no corporate act authorizing or directing the officer to be defended on behalf of the corporation.

The assent of the corporation to this proceeding must therefore be presumed.

Again ; the party here has no other remedy at law.   Three remedies have been suggested :

1. Specific performance.   That is an equitable, not a legal remedy.   The existence of an equitable remedy constitutes no impediment to the remedy by mandamus.   (10 *Wend.* 395.)

2. Action for the price.

3. Action for damages for not accepting the conveyances.

The relator offered to sell the property either for cash or for corporate bonds.   The corporation accepted the offer, the payment therefor to be made in corporate bonds.   This constituted an agreement whereby payment was to be in bonds. There is no legal remedy other than mandamus by which the relator can obtain the bonds.   The party is entitled to the payment of the price in the mode provided for, and he should not be compelled to accept any thing in substitution thereof, which would be the effect of a resort to any legal remedy other than a mandamus.

The fact that one has an action for damages for breach of official duty appears to have been conceded as forming no obstacle to the remedy by mandamus.   Thus in the case of *The People* v. *Mayor &c. of New York*, (10 *Wend.* 395,) it was held that a mandamus would lie to compel the execution to the relator of a lease of property purchased by him on a sale for taxes.   In *Van Rensselaer* v. *Sheriff of Albany*, (1 *Cowen*, 501,) a mandamus was issued compelling a sheriff to execute a deed to a redeeming creditor.   In both of which cases an action for damages would lie equally as well as in the present.   The issuing of these bonds is an official duty.

From motives of public policy the relator should not be put to an action for the price, or for damages, against the corporation.   The corporation should not be compelled to pay the price in a mode other than that they have seen fit to designate, or to be mulcted in large damages, and should not be subjected to the expenses of a litigation because one of

the corporate officers, without any authority, but of his own mere will, refuses to obey the corporate command. Nor does the law require, nor is there any propriety in requiring the relator to look simply to a money judgment against a person other than those he has contracted with.

As respects the equitable action for specific performance, although this forms no legal impediment to proceeding by mandamus yet, as a general rule, where a party has such remedy a mandamus should be denied. But in all cases where an officer of a corporation refuses to comply with the lawful directions of the corporate body, and a mandamus is sued out by the party for whose benefit and in whose favor the directions are given, with the consent of the corporate body, the party should not and will not be put to an action against the corporate body for a specific performance. There is no propriety or reason, in such case, for subjecting either the corporate body or the party to the delay or expenses of a suit.

With respect to an action for specific performance against the officer, it is, to say the least, very doubtful whether such an action would lie, as he is not a party to the contract. Even were it less doubtful there is no very substantial reason why an action against him should be resorted to, for enforcing the performance of an official duty of this character.

The next point for consideration is whether the court had power to order a peremptory mandamus without the previous issue of an alternative writ. The objection which is urged is that here are disputed facts which renders an alternative imperative. To this it is a sufficient answer that the parties below made no objection to the court adjudicating upon all the questions raised, whether of law or of fact, on the affidavits, and it was in fact so adjudicated by their consent. The counsel for the defendant does not make the point on this appeal. It was competent for the parties to waive the provisions of the statute. They having waived those provisions, it does not lie with any other person to raise an objection.

As, however, this point has been insisted on with great earnestness, by counsel who was allowed to present his views as *amicus curiæ*, it is proper to consider the point in another light, viz: as to whether, admitting the disputed fact to be as the defendant alleges it to be, it forms an excuse to the defendant for not obeying the resolutions. If it does not, then there can be no necessity for a trial to ascertain what the fact is.

It is well settled by a long series of decisions that where on an order to show cause the facts are admitted, or the excuse offered is insufficient, the court will, if the decision be in favor of the relator, direct a peremptory mandamus. ·The present case falls within this principle. The only matters of fact alleged to be in dispute are: 1st. Whether Simeon Draper was interested in the original purchase of the property in question from the city; 2d. Whether he ever had any interest in the land; and 3d. Whether the title to the property was ever in him.

The second and third matters are wholly immaterial, except as evidence tending to show the first. There is no law preventing or affecting a purchase by or a title held by a city officer, from a third person, of land granted to that third person by the city; nor would the fact that a city officer had, at some anterior time, held the title to land which had by mesne conveyances become vested in the city, affect the title of a purchaser from the city of that land.

The only material disputed fact (if a fact can be said to be disputed when it is not distinctly controverted, but only inferentially by the statement of other facts which would admit of a construction either in consonance with or dissonance to the fact alleged to be in dispute,) is as to whether Simeon Draper was interested in the original purchase.

Now assuming the fact to be that he was so interested, (although the papers submitted on behalf of the comptroller do not distinctly allege such to be the case,) that fact affords no excuse for the refusal of the comptroller to comply with the resolution of the common council. It is said that the

existence of this fact renders the conveyance to Draper and the conveyances to Varnum void; and this is said to result from the fact of Mr. Draper having been at that time one of the governors of the alms house. It is true that the judge who delivered the prevailing opinion of the court of appeals, in the case of *Roosevelt* v. *Draper*, (23 *N. Y. Rep.* 329,) in the course of his opinion, says that Mr. Draper, as such governor, was forbidden by the city charter to be concerned in the purchase; but in the same connection he intimates that the only party who could take advantage of that circumstance would be the city, to impeach the conveyance. It is, in that case, distinctly held that neither a corporator nor a tax payer can impeach the conveyance, nor can a creditor, unless the act done be such as to deprive him of his security to an extent which would hazard the realization of his demand. There is no other party who can act but the city. This decision was made in June, 1861. As yet the city has taken no proceeding to impeach the conveyance; on the contrary the corporate body, by the resolution in question and by not authorizing their officer to resist this application on their behalf, have ratified the transactions. For this reason the defendant cannot object, on the ground of any invalidity in the transfer of the property of the city, arising out of the fact of the alleged incapacity of Mr. Draper to be interested in the purchase.

Again; under the resolution all that was left to the comptroller to determine on was as to the form of the deed, as to whether it was executed by all the parties appearing on the record to be the owners of the premises by title derived from or through Joseph B. Varnum, and as to whether the property was free from incumbrances except taxes and assessments.

On all these points the comptroller was satisfied. He was not authorized under the resolution to inquire into any other matters. But granting that he could have gone to the extent of ascertaining whether the title of the property was such that the corporation would have a title thereto after the exe-

cution of the deed, even then there was no foundation for a refusal, on this ground. The record title was clearly in the grantors named in the deed, and that title joined to the then existing title of the corporation, if it had any, gave the corporation a perfect title on the record; if it had no existing title then the deed gave it a title.

Viewing this alleged fact of the interest of Draper in connection with other facts, there will appear another reason why such interest formed no excuse for not complying with the resolution.

These other facts are that it was in dispute as to whether Draper was interested in the original purchase; and second, as to whether Draper came within the prohibition; for the decision in the case in 23 *New York Reports* turned on other grounds; and third, that other parties held the record title. A corporation has equal power and right as an individual to compromise a litigation, or any difficulty tending to litigation or any disputed title. When the resolution in question was passed it must be assumed that the corporate body knew the exact state of its title. The form of the resolution, and the fact that although the alleged defect in the title has been brought to their notice by the defendant, they have not authorized a defense to this proceeding on behalf of the corporation, show that they were aware of the state of the title, and that by the resolution they intended to compromise the vexed question existing between the corporation and the person holding a record title. The will of the corporate body to make the compromise having been declared by the resolution, it did not lie with the defendant to gainsay that will.

As then the only material disputed fact did not, even conceding it to be as the defendant alleged, furnish any satisfactory cause against issuing the mandamus, it was wholly unnecessary to direct an alternative writ for the purpose of having a trial respecting that fact.

But it is further urged that upon the admitted facts appearing on the papers, and assuming it to be the fact that

Draper was interested in the purchase, the mandamus should not have been granted. And this is urged on three grounds :

Firstly. On the ground that by reason of various matters the grantors in the deed tendered had no title, but the title was already in the city.

Secondly. That there were various defects and informalities in the passing of these resolutions of purchase, and a want of power to pass them.

Thirdly. That the offer of the relator, and the resolution of the common council, did not create a valid contract, because the relator at the time owned only one third, and did not pretend and had no authority to contract for his co-tenants.

The matters relied on in support of the first ground are that Mr. Draper was interested in the original purchase ; that by the terms of the sale by the city, six per cent only was reserved in the mortgage ; and that the sale was not conducted in accordance with the provisions of the ordinances.

With reference to the interest of Mr. Draper, it is above shown that even assuming the fact to be, that he was so interested, that fact does not excuse the defendant. The papers presented on this appeal, however, do not show him to have been so interested. It is nowhere sworn to on behalf of the defendant that Draper was so interested ; but the inference is sought to be drawn from the fact that the deed was made to him and that he made the cash payment that was required. Mr. Draper, however, expressly and distinctly swears that he did not know the original purchaser (Mr. Lovejoy) before the purchase made by him, (Lovejoy ;) that he, Draper, had nothing to do with the city authorities, either directly or indirectly, in the purchase ; that he came into the purchase accidentally, and he details the manner in which, after the purchase was made from the city, by Lovejoy, he became interested therein.

This clear and positive statement must outweigh the mere inference to be drawn from the fact of the deed being at first

given to Draper and of the payment made by him. It is not uncommon upon a sale of real estate, for the original purchaser to part with his interest to a third person in no way connected with the original purchase, and to have the deed pass directly to that third person.

So that whether the judge below decided on the ground that Draper was not interested in the original purchase, or on the ground that, conceding that he was so interested, that fact formed no excuse to the defendant, his decision in either aspect, so far as this objection goes, was correct.

Now as to the other matters relied upon in support of the first ground, the same line of reasoning which has led to the conclusion that an interest by Draper in the original purchase does not excuse the defendant, also leads to the conclusion that the rate of interest and the manner of conducting the proceedings on the sale by the city form no excuse to the defendant for not complying with the resolution. And as regards the proceedings for the original sale by the city, they are stated by the judge who delivered the opinion of the court of appeals in *Roosevelt* v. *Draper*, to have been perfectly regular and according to law, excepting only the reservation of six per cent instead of seven per cent interest, on the mortgage. Whatever effect that defect of the reservation of interest might have on the original conveyance by the city, it can only be taken advantage of *by the city*, in the same manner as the objection arising from Draper's interest can be taken advantage of. The same reasons which debar the defendant from setting up in answer to this application the fact of the interest of Draper also debar him from setting up the defect in the reservation of interest.

With respect to the second ground, it is alleged that the common council cannot enter into a contract by resolution, as in this case; because such an act is legislative, and the 11th section of the act of 1857 declares that any legislative act of the city must be by *ordinance*. Conceding the act in question to be legislative, yet the 11th section referred to

expressly provides that every legislative act may be by ordinance, act or *resolution.* In what manner the resolution can infringe sections 28 and 38 of that act is not perceived.

It is further urged that the resolution violates section 37, in that after the veto of the mayor it was passed by both boards on the same day. The provision of section 37 is that no ordinance which shall have passed one board shall be acted on by the other board on the same day, *unless by unanimous consent,* &c. In this case there was unanimous consent.

It is further urged that the resolution directing the payment of the purchase money is of no validity, in consequence of the provisions of the 32d section of the act of 1857, which provides that the common council shall have no authority to borrow any sum whatever on the credit of the corporation, except in specified cases ; and it is contended that a direction to pay in bonds is indirectly borrowing money, as section 31 of the act of 1857 does not permit any money to be paid out of the treasury without a previous appropriation.

The word borrow must be taken in its ordinary acceptation. The city cannot be said to borrow money by the issue of the bonds in question, any more than a man who buys goods and gives his note therefor can be said to borrow of his vendor, which can hardly be pretended. When it becomes necessary to pay the bonds, these provisions may be applicable.

The only question that can now arise is whether the corporation had power to contract a debt for the purchase money of the land. If it had power to contract the debt, the right and power to issue the obligation therefor follow as an incident, unless that incident has been expressly taken away by some positive statutory enactment. No such statutory enactment has been referred to.

Section 28 of the act of 1857 refers to the incurring of expense by the departments; section 31 to the drawing of money from the treasury; section 33 to the borrowing of money ; and section 38 to work to be done and supplies to be furnished, and to the sale of property by the corporation. As

to the act of 1853, it is only necessary to refer to the opinion delivered in *Ketchum* v. *City of Buffalo*, (21 *Barb.* 294.) That was a case of a sale of real estate to the city for a market and a payment of part of the purchase money by a city bond. The court, in the course of its opinion says: "This is a simple debt against the city, and as it does not appear that in creating it the common council exceeded the limitations contained in section 3, the evidence of the debt is not void according to section 2." (*Cited from page* 307.)

Now this property was purchased for market purposes. The corporation of the city of New York has full power to establish markets, and, as incident to that, to purchase a place necessary therefor. These are the views entertained by Justice INGRAHAM in *The People* v. *Lowber*, (28 *Barb.* 65.) The same views are entertained by the court in the case of *Ketchum* v. *The City of Buffalo*, (21 *id.* 294.) A power to purchase carries with it a power to incur an indebtedness for the purchase money, and to provide for the payment of the indebtedness, unless, indeed, that power is so restricted as that it cannot be exercised unless there is sufficient funds in hand to pay for the property. No such restriction can be found. If the corporation has funds which can be appropriated to the payment, the indebtedness may be discharged at the moment of its creation. If it has no such funds, then it may purchase on credit, and may issue its obligations undertaking to pay the indebtedness at a subsequent, future time, and make subsequent provision for the payment of them.

To the objection that the relator owned only a third in the land at the time of his offer, and that it does not appear on the papers that he had any authority to contract for the other owners, there are two answers: 1st. The extent of his ownership at that time is immaterial: it is sufficient if at the time when the deed was to be delivered he was able to tender a deed executed by the proper parties. 2d. The objection was not taken below, when it might have been obviated by

The People *v.* Brennan.

showing an authority from the other parties.  It cannot be taken on appeal, for the first time.

There is but one objection remaining to be considered, viz, that it is not in the power of the comptroller to execute the corporate bonds of the city.  It is however within the comptroller's power to do those acts which lie with his department, and which are personal to himself, viz, the preparation of the bonds, and his signature to them.  The order directing the peremptory writ to issue, so far as it directs that writ to command the comptroller to procure the signature of the mayor and the corporate seal to be affixed to the bonds, is clearly erroneous, and should in these respects be reversed.

In conclusion, it is to be observed that there is no allegation of any fraud in the original sale by the corporation, or in the purchase by it.  The mandamus is resisted solely on the ground of alleged infraction of statutory law.  These matters have been fully presented and considered ; and the court is of opinion that, notwithstanding the objections arising out of these statutory provisions, the relator is entitled to have the price agreed to be paid.

No question is raised as to the necessity or wisdom of purchasing land for a market in this locality.  Even if there had been, this court could not interfere.  In the language of Judge INGRAHAM, "However unwise, improvident, extravagant or unnecessary a purchase a municipal corporation may intend to make, neither the attorney general nor any tax payer has, in my judgment, any right to interfere by action and by injunction ;" and in the language of the court of appeals, " an act of administration likely to produce taxation, is an affair altogether public, and the only remedial process against the abuse of administrative power, tending to taxation, is furnished by the elective franchise, or a proceeding in behalf of the state ; or in case of an act without jurisdiction, in treating the attempt to enforce the illegal tax as an act of trespass."

The order, so far as it directs the comptroller to procure the signature of the mayor and the corporate seal to be affixed to the bonds, reversed; in other respects affirmed; with the modifiation that the comptroller, after having signed the bonds, shall deliver them to the relator on the receipt of the deed heretofore tendered, leaving it to the relator to have the other formalities observed which he may deem necessary.

SUTHERLAND, J. concurred.

CLERKE, J. (dissenting.) I suppose, as we intimated in *The People on the relation of Green* v. *Wood,* (35 *Barb.* 653,) that we should consider ourselves constrained, under the authority of *The People* v. *Flagg,* (16 *Barb.* 503,) to *entertain* the application in this case; the common council having ordered a specific act to be done by the comptroller, in order to complete their alleged contract with the relator. Although the relator, in that case, had his ordinary legal remedy against the corporation, the court granted the mandamus against the comptroller. The case now before us amply illustrates the danger of the principle upon which the decision in *The People* v. *Flagg* is founded, and of departing from the salutary rule that when a party has a plain and adequate remedy by an ordinary action, if he has any remedy at all, this extraordinary remedy by a writ of *mandamus* should not be extended to him. Where disputed facts and complicated legal questions are involved, justice can be more safely and conveniently administered by the ordinary course and practice of the law than by a resort to the method attempted in this case. At all events, it is quite evident to my mind that a peremptory mandamus ought not to have been allowed in the first instance. A case involving so large an amount of property and presenting a state of facts which, to say the least, were calculated to demand grave deliberation and inquiry, never should have been disposed of on affi-

davits. To be sure it is said that the counsel for the comptroller did not object to this disposition of the case; but I think that this absence of a positive objection was not sufficient, and that, if the case was deemed a proper one, an *alternative* mandamus should only be issued; unless the counsel expressly stipulated to submit the question whether a peremptory mandamus should issue; and therefore I am satisfied, if the application be entertained at all, that an alternative and not a peremptory mandamus should be issued.

The order should be reversed, or should be so far modified as to direct that an alternative mandamus should be issued, so that a return may be made, giving to the relator an opportunity to plead or demur, and, if issues of fact are joined, that they may be tried before a jury.

Order modified and affirmed.

[NEW YORK GENERAL TERM, May 4, 1863. *Sutherland, Clerke* and *Barnard*, Justices.]